[No. 14618.  Department Two.  March 2, 1918.]

BRADFORD-KENNEDY COMPANY, *Respondent*, v.
JAMES BUCHANAN, *Appellant*.[1]

BAILMENT—MANDATARY—LIABILITY—MEASURE—GROSS NEGLIGENCE.
A mandatary under a gratuitous bailment intrusted with money to
buy logs who honestly misconceived his instructions, is not held to
a strict accountability, but is liable only for such damage as actu-
ally occurred and only for his own gross negligence.

SAME—EVIDENCE—SUFFICIENCY. In such a case, liability is not
sustained where the evidence showed he profited nothing and the
money was not converted, but was at once devoted to the purchase
of logs and the payment of claims necessary to keep the company
in operation, and any negligence in the matter must be attributed
to the president of the shingle company who had complete control
of its affairs.

Appeal from a judgment of the superior court for
Pierce county, Clifford, J., entered April 17, 1917, upon
findings in favor of the plaintiff, in an action for con-
version, tried to the court.  Reversed.

*John E. Gallagher,* for appellant.

*J. H. Gordon* and *A. O. Burmeister,* for respondent.

HOLCOMB, J.—This case was formerly before this
court and reported in 91 Wash. 539, 158 Pac. 76.  Upon
appeal, the court remanded the cause for further proof
to be added to that already taken, and further pro-
ceedings not inconsistent with the opinion.  Among
other things, it was determined on the former appeal
that the cause had not been heard and decided below
upon the proper principles, that the evidence clearly
disclosed that appellant was a mandatary under a
gratuitous bailment to buy logs with his principal's
money, and, as such, is liable only for gross negligence,
and that, while he must not disregard plain instruc-

[1]Reported in 171 Pac. 228.

tions, he is not punished when he honestly mistakes instructions.

Upon the retrial below, no additional evidence was produced to show any other status on the part of appellant than that of gratuitous mandatary. He reiterated that his instructions were different from those asserted by respondent. In the former opinion is set forth a letter of instructions from respondent accompanying the money entrusted to appellant. Appellant insisted in the latter trial, as well as in the former, that he was to use the money as a sort of revolving log fund, that the respondent would demand free shingles only as the shingle company could afford to ship them without immediate payment, and would continue to pay for the shingles if necessary to keep the concern going, and be satisfied if shingles not shipped to it were sold and the proceeds used by Buchanan for the purchase of further logs as respondent's property.

In the former opinion, it was also stated that "it should be proved beyond doubt that Buchanan had no right except to buy, cause to be manufactured, ship to Bradford, or re-sell and remit." There was no further testimony upon this point. Buchanan reasserted his understanding of an oral agreement which he said he had with Bradford, president of respondent, prior to the sending of the letter set forth in the former opinion, in which it was understood that the Tacoma Lumber & Shingle Company was to be kept on its feet and kept going. However that may be, when the remittance came, accompanied by the letter of instructions, it was the duty of Buchanan to disavow the terms under which it was sent, and if he did not, he must be presumed to have acquiesced in and tacitly consented thereto. He would not, however, be held under a mandatary's liability to a strict accountability, as would a paid bailee. Having again shown, doubtless honestly,

that he misconceived his instructions, he could, as said in the former appeal, be held only for such damages as actually occurred, and only for his own gross negligence. The trial court again held that the net value of the shingles purchased with the $2,000, had the logs been delivered to the Tacoma Lumber & Shingle Company to be sold for the account of respondent and twenty-five cents per thousand deducted for the sawing, drying, loading, etc., was $2,000, and that respondent was entitled to that sum, with interest from April 1, 1913, together with costs and costs on the former appeal.

At the last trial, respondent introduced the evidence of one wholly disinterested witness, one Hagburg, whose testimony is convincing that the minimum net market price of the ordinary brand of shingles after February 24, when the money was advanced to appellant, and before April 1, when the Tacoma Lumber & Shingle Company became insolvent and went into the hands of a receiver for liquidation, was $1.60 per thousand on board car, and that the minimum net market value of clears, or the higher grade of shingles, was $1.90 per thousand at the mill during that time. The minimum must be taken as the definitely established price rather than the maximum. It is also shown by this witness that the average price of logs during that time was $12 per thousand; that $2,000 would have bought during that time 166,600 feet; that, therefore, the logs could be manufactured into 10,000 shingles per thousand feet of logs, or 1,666,000 shingles; that the logs averaged one-fourth clears, or the higher grade, and three-fourths stars, or the ordinary grade. According to these figures, the net value of the shingles which during that time could have been produced at the mill in Tacoma would have been approximately $2,800. This includes the price of seventy-five cents

per thousand for sawing, drying, loading, etc., and also includes an average of twelve cents per thousand, amounting to $200, for underweights on shipments of shingles to which the manufacturer is entitled. As respondent concedes, it was required to pay seventy-five cents per thousand for sawing, drying and loading the shingles which would have been its own; that, of course, should be deducted, and on 1,666,000 shingles, that amounts to approximately $1,250. The most, therefore, the respondent could be entitled to under the new evidence, if appellant is liable at all, is the sum of $1,750, with interest from April 1, 1913, at the legal rate.

But we are not satisfied that respondent was entitled to recover anything. The evidence is no different from that before upon the question of the gratuitous bailment. Respondent's president admitted in the former hearing that appellant was to receive nothing for his services. Appellant was no more, but rather much less, concerned in the affairs of the Tacoma Lumber & Shingle Company than was respondent itself. Respondent had advanced to that company about $2,500, for which it held a mortgage, and had a contract with it whereby it was to manufacture and deliver shingles to respondent at ten cents per M. less than the market price at any time, and certain other deductions were to be applied to the shingle company's account. After February 24, 1913, twenty-three cars containing 5,803,000 shingles were shipped to respondent under this prior arrangement, to respondent's total gain of $2,448.07. At the time of the advancement by respondent to appellant of the $2,000, the president of respondent was in Tacoma and was familiar with the condition and affairs of the Tacoma Lumber & Shingle Company. He was, in fact, well acquainted with one Crandall, who was the president and general manager

of the shingle company and was a former employee of respondent. Appellant was the friend of another of the stockholders, one LaVergne. It seems that both respondent's president and appellant had become interested in the affairs of the shingle company, the one for its own security, and the other gratuitously. The shingle company was in a precarious financial condition and could not obtain logs sufficient for its operations. Appellant was never at any time interested financially in the shingle company and never had any interest in its operations, except to see it succeed. He profited not a cent from the money entrusted to him, nor from his other activities in behalf of the shingle company. The money entrusted to him, as was shown in the former opinion, was not converted by him, but was at once devoted to the purchase of logs, together with much more of appellant's own money. Several pressing debts of the shingle company were also paid by appellant, either out of the funds of respondent and his own or funds derived from the shipment of shingles to respondent. The payment of most of the claims paid was necessary in order to continue operations and protect the business of the shingle company, and even the logs of respondent, as was stated in the former opinion, would become involved in laborers' claims in the event of failure, and probably receivership expenses, which afterwards proved to be true. The instructions given by respondent when transmitting the money to appellant required that shipments should be made as rapidly as possible and the amount returned as soon as it could be done *without inconvenience to the operation.* From the evidence, in both the former and the last trial, it is evident that the money could not have been returned prior to April 1, when the company went into liquidation, "without inconvenience to its operation."

Under this provision, appellant could easily err honestly in his duty, even had he been a paid bailee.

The record is also convincing that Crandall, president and general manager of the shingle company and long-time friend of the president of respondent, persisted in shipping to respondent shingles manufactured out of the logs bought by appellant as if under the old contract the shingle company had with respondent, ignoring the new arrangement made by respondent with appellant. Notwithstanding repeated protests on the part of respondent to Crandall, and at least once to appellant, that method was pursued till the last. Indeed, it seems almost impossible, considering the capacity of the shingle company, physically and financially, to have complied with both arrangements with respondent during that period. It seems clear from the evidence, if there was any gross negligence in dealing with respondent's affairs, it must be attributed to Crandall. Appellant had no power in the management of the shingle company's business, and Crandall had sole power therein. It is to be remembered that the $2,000 was advanced to appellant for the sole benefit of the shingle company and respondent itself. Appellant profited nothing, either directly or indirectly, through the bailment entrusted to him. Respondent obtained from the logs purchased for the shingle company, upon its former debt and in profits, $2,448.

Unfortunate as it may be that respondent must lose the amount entrusted to appellant as a gratuitous bailment, there is no convincing evidence shown on either hearing in the case that the money was lost through the gross negligence of appellant.

The judgment is reversed and the action dismissed.

ELLIS, C. J., CHADWICK, and MORRIS, JJ., concur.